UNITED STATES F. & G. CO. v. DOWDY, Adm'x.

No. 33723.   May 16, 1950.

Rehearing Denied June 13, 1950.

*219 P. 2d 215.*

Wells & Wells, of Seminole, for plaintiff in error.

Clyde Busey and C. H. Baskin, both of Holdenville, for defendant in error.

HALLEY, J. Macie Dowdy, administratrix of the estate of W. W. Dowdy, deceased, sued the United States Fidelity & Guaranty Company to recover upon what is termed a "volunteer fire company blanket accident policy", sometimes referred to as a "limited accident policy". W. W. Dowdy was a member of the Fire Department of the city of Holdenville, which secured accident insurance for its firemen. The policy involved here provides:

". . . Against Bodily Injuries suffered by any such insured member while actually on duty as a fireman and as a member of said Fire Company, (including injuries sustained while going to or returning from fires, at fire drills, parades or at tests or trials of any fire-fighting apparatus) and not otherwise, and effected, independently and exclusively of all other causes, through external, violent and accidental means (hereinafter referred to as 'such injuries'), as follows: . . ."

The policy provides in Part A for the payment of $3,000 for loss of life, and the same sum for loss of hands, eyes, or feet. Part B provides for "Weekly Indemnity" for not more than 52 weeks for one suffering injuries making him unable to carry on his regular work. Part C, as provided in the original policy, is superseded by what is termed a "Reimbursement Rider" effective August 2, 1944.

On July 23, 1946, W. W. Dowdy was working at a fire and became overheated and exhausted, and on July 27, 1946, while engaged at a fire, he was struck by a coupling on the fire hose, which was being removed from a truck. He died on December 6, 1946, without being able to resume his usual work as a fireman.

There was no dispute as to the insurance being in effect at the date of his death, or that he was injured while in the discharge of his duties as a fireman. The defendant denied that Dowdy's death was caused by or through "external, violent and accidental means", as covered by the policy, but claimed that his death was the result of cancer, and denied that it was responsible for any weekly indemnity payment or that it was responsible for any further expense due to his injuries, because his incapacity to work was not due to an accident exclusively and independently of all other causes.

The plaintiff abandoned her first cause of action for death. Her second cause of action was for $1,150, made up of weekly indemnity for 22 weeks, or $550, and the remainder of the medical expense and supplies.

The jury returned a verdict for $1,-150, which amount was reduced to $924.50 by voluntary remittitur of the plaintiff when motion for a new trial was heard, and judgment was entered for the latter sum. The defendant has appealed, and the parties will be referred to as they appeared below.

Since the plaintiff's first cause of action, covering the amount shown on the face of the policy for death, has been abandoned, it is only necessary to consider the two provisions of the policy covering "Weekly Indemnity" and medical expense, payable where the beneficiary is injured in line of duty and such injuries disable him and require medical care and expenses. The applicable clauses of the policy covering disabling injuries not otherwise specifically covered are Part B and a "Reimbursement Rider" added on August 2, 1944, in lieu of Part C of the original policy. These provisions are as follows:

"Part B. Or, if 'such injuries' independently and exclusive of all other causes, shall from the date of the accident wholly and continuously disable the insured member and prevent him from performing any and every kind of duty pertaining to his usual and ordinary occupation, the company will pay weekly indemnity at the rate hereinabove specified for the period of such continuous total disability, but not exceeding Fifty-two (52) consecutive weeks."

The "Reimbursement Rider" attached to the policy in lieu of Part C is as follows:

"Hospital, Nurses, Medical and Surgical Expense.—If injuries covered by this policy, directly and independently of all other causes, shall require within twenty-six weeks from the date of accident, medical or surgical treatment, hospital confinement or the employment of a trained nurse, the Company will pay, in addition to any other indemnity to which the insured member may be entitled, the actual expense of such treatment, hospital charges and nurses fees, up to an amount not exceeding Five Hundred Dollars ($500.-00) for injuries sustained by any one member in one accident. Subject otherwise to all the terms, limits and conditions of the policy to which this rider is attached. This Rider is effective as of August 2nd, 1944. Attached to and forming part of Policy No. VFC-446 issued by the United States Fidelity and Guaranty Company, of Baltimore, Maryland."

The defendant contends that plaintiff is not entitled to recover any sum because her deceased's death was the result of cancer at the head of the pancreas, and that the injuries suffered in line of duty in July of 1946 were not "independently and exclusively of all other causes."

The injuries claimed by the plaintiff were not such as were covered by Part A, which covered death or the loss of certain members of the body, but might fall within Part B. The evidence was undisputed that the injuries to W. W. Dowdy resulted in complete disablement up to the time of his death. He had served as a member of the Fire Department for some ten or twelve years. He was very active and had never lost any time on account of ill health. From the date of his injuries to the date of his death was slightly less than the 52 weeks provided in Part B.

The only medical testimony offered was that of Dr. Clyde Kernek, who testified in part as follows:

"Q. Doctor, are you able to tell this court and jury what was the direct and proximate cause of Dowdy's death? A. My diagnosis as to the cause of death was cancer at the head of the pancreas. Q. You filled out and furnished the State Health Department a certificate of the death, didn't you, Doctor? A. Yes, sir. . . . Q. You stated in your certificate that in your judgment W. W. Dowdy had cancer at least six months prior to his death, did you not? A. It's considered, seated at the head of the pancreas, it takes about six months to kill them. . . . Q. Now, in your judgment, Mr. Dowdy had been afflicted with cancer at least six months prior to his death? A. Probably so. I mean that's the general opinion on cancer at the head of the pancreas. Q. Now, in your judgment, did the injury, if he received one, have anything to do with the development of the cancer? A. No, I don't feel—we don't know what causes them—I'll have to answer it this way—we don't know what causes it; some intend to feel that it's injury sometimes, trauma has something to do with it. In his case we couldn't say. Q. Well, now, do you recall writing a letter to the United States Fidelity and Guaranty Company, telling the company of your examination and his condition and what you found? A. Yes, sir."

Dr. Kernek made a report to the Department of Public Health, and reported to the insurer in the form of a letter, which was introduced in evidence. He stated, in substance, that Mr. Dowdy came to his office on August 2, 1946, complaining of having become overheated and overtired while fighting a fire at the local Fair Grounds. He was advised to go to bed and was given medicines. He appeared to improve, but on August 12, 1946, he began to have abdominal discomfort. On August 18, 1946, he first noticed that his skin was yellow. On September 10th, his liver was found to be enlarged and his gall bladder was out of order. Sometime in September, his trouble was first diagnosed as cancer at the head of the pancreas; he was operated to drain his gall bladder, but developed pneumonia, and was removed from the hos-

pital to his home in about two weeks. The cancer enlarged fairly rapidly, and he lost weight and strength. Dr. Kernek, in his report, then said:

"It is my opinion that Mr. W. W. Dowdy had an early breakdown of his health by exerting himself at the fire that he attended, however the exertion had nothing to do with the cancer."

The doctor further testified:

"Q. Now, Doctor, when you filled out that death certificate, you, at that time, was giving the State Health Department the benefit of your very best judgment, were you not? A. That's right. Q. And at that time you told the State Health Department, that he died; that the cause of his death was cancer of the pancreas? A. That's right. Q. Now, when you were called upon by the insurance company to give it a report, you did that just as honestly as you knew how, did you not? A. That's right. Q. And you endeavored to tell the insurance company the whole truth, did you not? A. I did. Q. And you told the insurance company that in your judgment the injuries, if he had any, had nothing to do with the cancer? A. That's right. Q. And that's still your judgment, isn't it? A. That's right."

There was no controversy over the fact that Mr. Dowdy was completely and continuously incapacitated from performing his usual duties as a fireman from the date of his injuries to the date of his death.

The defendant contends that under the undisputed medical testimony, the court should have sustained a demurrer to the petition and to the evidence of the plaintiff, and should have sustained a motion for a directed verdict, or should have rendered judgment in favor of the defendant notwithstanding the verdict.

It will be noted that there was a positive statement by Dr. Kernek that the early breakdown in Mr. Dowdy's health was the result of his overexertion at the fire, but that the exertion which caused his early breakdown had nothing to do with the cancer. We think it a fair construction of the meaning of this statement that his injuries at the fire were the cause of his breakdown in health, independent of all other causes at the time, but that the injuries had nothing to do with creating or causing the cancer.

We note further that the above testimony of Dr. Kernek discloses some doubt and uncertainty as to the exact time when the cancerous condition— first definitely diagnosed as cancer in September, 1946—originated. He says it is generally thought that such a cancer causes death in about six months. He definitely states that "we (the medical profession) don't know what causes them (cancer)"; that some think injuries, or trauma, have something to do with causing cancer; that "in his case, we couldn't say." The doctor did say he thought Mr. Dowdy had cancer at least six months before his death, because people generally died in about six months when they had a cancer of that kind. He was asked:

"Q. Now, in your judgment, Mr. Dowdy had been afflicted with cancer at least six months prior to his death? A. Probably so. I mean, that is the general opinion on cancer at the head of the pancreas."

If the incapacity to work was the result of the injuries, independently and exclusively of all other causes, then the plaintiff would be entitled to weekly indemnity under Part B of the policy. If his injuries incapacitated him within 22 weeks after the date of the injuries, then the policy covered medical expenses and supplies as provided in the rider above mentioned.

The evidence establishes beyond doubt that up to the time of his injuries in July, 1946, Mr. Dowdy's health had been good. He had not been heard to complain prior to that time. He had not missed a single tour of duty. His first complaint was to his son at the Fair Grounds fire, where he was hurt in the side with a hose connection. His son took him home. Mr. Dowdy's wife, his son, Clyde Dowdy, Leonard Bise, a young fireman, and

211

the fire chief, Jack Lowrance, all testified that he was active, energetic, and strong prior to his injuries in July.

Dr. Kernek further testified:

"Q. Now, if it develops that Mr. Dowdy received a lick in the—somewhere in the lower abdomen here, knocking him down and knocking him out temporarily, you wouldn't be able to say whether that lick would cause cancer or not, would you? A. That's right; I couldn't say. Q. You couldn't say? We might as well—the medical profession might as well guess that the overheating or the lick in the stomach caused it as anything else, hadn't we? A. Well, because it is not known and because everybody that gets a lick there don't develop cancer, I mean, you couldn't say. Q. No, but there is a kind of feeling among the medical profession that if a man gets a lick, it could go into cancer. Isn't there that kind of feeling among the medical profession? A. Probably some of them."

The same doctor also testified that no laboratory test was made to determine for certain that Mr. Dowdy had died of cancer. It seems unreasonable that a man in good health and an energetic worker would be so suddenly stricken as not to be able to work another day, and then live another six months. The evidence shows that he was overcome by heat and smoke at one fire, and then, within a few days, struck by a hose coupling at another. He went to his quarters and vomited. The fire chief sent him home. These facts are firmly established.

In Provident Life & Accident Insurance Co. v. Green, 172 Okla. 591, 46 P. 2d 372, this court held that death from sunstroke was the result of "bodily injuries sustained through external, violent and accidental means", within an accident policy similar to the one held by the insured in this case. This decision is followed in Maryland Casualty Co. v. Hazen, 182 Okla. 623, 79 P. 2d 577, which announces:

"Syl. 1. Death from sunstroke held to be an 'effect resulting from bodily injuries sustained through external, vio-

lent, and accidental means, and within the terms of an accident insurance policy insuring against the effects resulting directly and exclusively of all other causes from bodily injuries sustained . . . solely through external, violent and accidental means. . . .' Provident Life & Accident Ins. Co. v. Green, 172 Okla. 591, 46 P. 2d 372.

"Syl. 2. In an action on an insurance contract, in order to sustain a defense that the accident was contributed to by disease or bodily or mental infirmity so as to prevent a recovery, the evidence must disclose that the disease or infirmity was so considerable or significant as to be characterized as disease or infirmity in the common speech of men."

The only testimony as to the cause of death in the case under consideration is that Mr. Dowdy died from cancer. However, his case was not diagnosed as cancer until September, 1946, some two or three months after his accidental injuries, which resulted in complete disability to follow his usual work. After his trouble was diagnosed as cancer in September, 1946, he lived until December 27, 1946. The doctor was positive that cancer caused his death, but naturally could not give the exact date of its origin. His opinion as to when the cancer originated was simply an opinion based upon experience that patients usually lived about six months after such a cancer was discovered.

Due to the testimony of Dr. Kernek that the exact date of the origin of the cancer could not be definitely established, and his testimony as to the reason for the early breakdown of Dowdy's health, together with the undisputed testimony of the deceased's disability being continuous after the injuries suffered in line of duty, and the fact that such injuries were the result of violent, external and accidental means, we conclude that the jury may have reasonably inferred from the evidence that Dowdy's incapacity was the result of his injuries in line of duty, despite the fact that cancer was the

212

proximate cause of his death. If sun-stroke is such an external, violent and accidental injury as falls within the terms of the policy, then certainly over-heating and over-exhaustion may be classified as such an accidental injury; and there can be no question but that being struck by a hose coupling was such an injury as fell within the classi-fication covered by the policy. We can-not say that there is no evidence to support the verdict of the jury. We conclude that there is some evidence in the record from which the jury might reasonably infer that the inability of the deceased to work after the date of his accident was because of the injuries suffered in line of duty; and the judg-ment of the trial court is therefore af-firmed.

DAVISON, C. J., ARNOLD, V. C. J., and WELCH, CORN, JOHNSON, and O'NEAL, JJ., concur. GIBSON and LUTTRELL, JJ., dissent.